**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


**JILL JURGESS,**

               **Plaintiff,**

**v.**                                  **CASE NO. 05-71241**
                                    **HONORABLE DENISE PAGE HOOD**


**LOWE'S HOME CENTERS, INC.,**
**a foreign corporation,**

               **Defendant.**
_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.**    **INTRODUCTION**

       This matter is before the Court on Defendant's Motion for Summary Judgment, filed on January 17, 2006. Plaintiff filed a Response to Defendant's Motion for Summary Judgment on February 13, 2006. On February 21, 2006, Defendant filed a Reply to Plaintiff's Response.

       On February 22, 2005, Plaintiff initiated this action in Lenawee County Circuit Court alleging her employer, Defendant Lowe's Home Centers, Inc. violated the Michigan's Persons with Disability Civil Rights Act (Count I), and violated the Elliott-Larsen Civil Rights Act (Count II). On March 30, 2005, Defendant removed the instant matter to this Court pursuant to 28 U.S.C. § 1441.

**II.**    **STATEMENT OF FACTS**

       Plaintiff, Jill Jurgess, was an employee of Defendant, Lowe's Home Centers, Inc., at its Adrian, Michigan store from June, 1996 through November, 2003. (Def.'s Mot. for Summ. J., Pl.'s

Dep. Tr. at 11, 30, 58, 68 ).  Plaintiff was hired as a full-time customer service associate.  (*Id.* at 11).

Plaintiff was diagnosed with multiple sclerosis in 1993.  (*Id.* at 16-17).  Plaintiff testified that her

multiple sclerosis affects her ability to walk because her legs become weak.  (*Id.* at 17).  She also

has trouble with balance and coordination. (*Id.*).  All three of the above described symptoms cause

her to run into things, such as walls and furniture.  (*Id.*).  Plaintiff testified that it can also affect her

ability to speak. (*Id.* at 18)   At times her mind works faster than she can speak, and she also has

slurred speech.  (*Id.*).  If she is fatigued due to her multiple sclerosis, her ability to communicate is

negatively affected.  (*Id.* at 17-18).  Plaintiff further testified that at times her eyesight is affected

because she has trouble focusing.  (*Id.* at 19).  Additionally, she has trouble with hearing due to her

difficulty with concentrating.  (*Id.* at 20).  She also stated that she learns the requirements of a new

job better if training materials are presented in written format as opposed to on a computer screen.

(*Id.* at 21).  She struggles with standing and lifting things due to her inability to balance.  (*Id.* at 22).

Lastly, she testified that her work is not negatively affected, unless her work schedule is erratic

rather than set and consistent as to when her workdays begin and end.  (*Id.* at 23).  When she does

not have a schedule that begins and ends at the same time each day, her sleep schedule is thrown off,

she becomes exhausted, and wants to sleep all the time.  (*Id.* at 23-25).

In October 2003, Plaintiff was working in the stock department. (Def.'s Mot. for Summ. J.,

Ex. 3).  Employees working in the stock department, as opposed to other departments within the

store, have a set, regular schedule of Monday through Friday, 5:00 a.m. to 1:00 or 2:00 p.m.  (Def.'s

Mot. for Summ. J., Dep. Tr. Sondra Hauser, at 20 ).  On or about October 25, 2003, Defendant's

store manager, Russell Geekie, transferred Plaintiff to the electrical department.  (Def.'s Mot. for

Summ. J., Ex. 2, Geekie Aff., ¶13).  Defendant argues that Plaintiff was transferred due to a seasonal

2

slow down and staffing needs. (*Id.* at ¶¶ 8, 13). Plaintiff argues that she was transferred because Mr. Geekie did not believe women were as qualified and capable to work in the stock department compared to their male counterparts.[1] In support of this, Plaintiff argues that other female employees were transferred from the stock department at the same time that Plaintiff was transferred, while no male employees were transferred out of the stock department. (Def.'s Mot. for Summ. J., Dep. Tr. of Lori Rincon at 13-15). Further, the same day that Plaintiff was transferred out of the stock department, another male employee was transferred to the stock department. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 9). Defendant argues that not all of the female employees were transferred out of the stock department as Mr. Geekie left a female employee, Lori Rincon, in the stock department.[2] (Def.'s Mot. for Summ. J., Dep. Tr. of Lori Rincon, at 14-18, 24-26). Additionally, Plaintiff testified that Mr. Geekie only issued warnings to males who underperformed, while he removed females from the department who he perceived as underperforming. (Def.'s Mot. for Summ. J, Pl.'s Dep. Tr. at 118, 132).[3]

---

[1] Plaintiff and another employee testified about other female employees who believed that Mr. Geekie disfavored female employees. (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 131, Victor Tindall Dep. Tr. at 25). Additionally, at least one female employee requested a transfer that was directly related to a personality conflict with Mr. Geekie, and Mr. Geekie corroborated the existence of this conflict. (*Id.*, Dep. Tr. of Russell Geekie, at 45).

[2] It appears from Ms. Rincon's deposition testimony that Mr. Geekie originally planned on moving Ms. Rincon out of the stock department, but when she questioned him about rumors that all the females were being transferred out of the stock department, Mr. Geekie told her that she was going to remain in the stock department. (*Id.* at 16-18).

[3] Plaintiff stated in her deposition that at the time she was removed from the stocking department, Mr. Geekie was dissatisfied with her performance because she was only unloading three pallets per shift, while he expected five to seven pallets to be unloaded. Plaintiff further stated that she was always assigned to unload items for the paint department and these pallets contained somewhere between 100 to 150 items per pallet, and this should have been taken into consideration in evaluating her work performance.

3

Plaintiff testified that after her transfer to the electrical department her multiple sclerosis symptoms flared up because of the erratic schedule she was assigned to in that department.[4] (*Id.* at 23). Plaintiff also testified that within days of the transfer, she informed the electrical department manager, Dawn Clark, that she needed a set schedule so that her multiple sclerosis symptoms would not be further exacerbated. (*Id.* at 31, Dep. Tr. of Dawn Clark at 15). Defendant counters that when Plaintiff first requested a set schedule, she did not base her request on her health condition, but upon a desire to be home at night with her boyfriend. (Def.'s Mot. for Summ. J., Dep. Tr. of Dawn Clark at 12). Ms. Clark testified that it was not until Plaintiff requested a set schedule a second time that Plaintiff raised her medical condition as the basis. (*Id.* at 14-15). While Ms. Clark informed Plaintiff that she would do the best she could to try to give Plaintiff a set schedule, this did not occur. (Def.'s Mot. for Summ. J, Pl.'s Dep. Tr. at 34). Plaintiff tried to resolve the situation by trading shifts with another employee, but Ms. Clark eventually told Plaintiff that she could no longer do this. (*Id.*) Defendant asserts that the reason Ms. Clark put a stop to this arrangement was that on two occasions, Ms. Clark gave a work list to the employee, who failed to give this to Plaintiff, in which case the work did not get done. (Def.'s Mot. for Summ. J., Dep. Tr. of Dawn Clark, at 17-18, 31).[5] Ms. Clark testified that she inquired about the information Plaintiff provided on her job application in regard to her availability. Since Plaintiff had stated "open availability,"she told Plaintiff there was nothing

---

[4] There is no record of Plaintiff's schedule before November. Plaintiff's schedule the first week in November was 9:00 a.m to 4:00 p.m one day, 6:00 a.m. to 3:00 p.m. on three days, and 9:00 a.m. to 6:00 p.m. on one day. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 4). Additionally, Plaintiff testified that she still suffers from the symptoms that first presented themselves during her employment in the electrical department. (Def.'s Mot. for  Summ. J., Plf.'s Dep. Tr. at 24).

[5] Plaintiff argues that Ms. Clark told her that upper management indicated that Plaintiff could not trade shifts. (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 34-35).

4

2:05-cv-71241-DPH-RSW   Doc # 34   Filed 10/10/06   Pg 5 of 18   Pg ID 663

she could do.[6] (*Id.*).

On November 5, 2003, Plaintiff went to her six-month check up appointment with her treating neurologist, Dr. Poetschke. (*Id.* at 63).   Dr. Poetschke noted that based upon Plaintiff's reported symptoms, namely, exhaustion, diplopia, and ataxia/imbalance, that "not yet what I would classify a full blown exacerbation, but close." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 5).   On November 6, 2003, Plaintiff presented a written request for a set schedule to several employees at Defendant's Adrian store.[7] (*Id.* at 63).  Along with her request, Plaintiff included a note from Dr. Poetschke, which stated:

> To whom it may concern: In order to maintain normal function, Jill needs to maintain a regular work schedule, i.e. 4a-2p range with limit of 40 hrs/week.

On the same day, Ms. Hauser gave Plaintiff a "Reasonable Accommodation Request Form" to complete. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 8).  Plaintiff testified that Ms. Hauser informed her the request would take 48 hours to process.  (Def.'s Mot. for Summ. J, Pl.'s Dep. Tr. at 37, 59).  Plaintiff incorrectly stated that her accommodation request was for the period of November 6, 2003 through November 7, 2003.  Ms. Hauser testified that because of the short period

---

[6] Plaintiff denies writing this, or completing a job application at all. (Def.'s Mot. for Summ. J, Pl.'s Dep. Tr. at 134). The Court notes that the job application is not signed by Plaintiff.  Additionally, Plaintiff submitted an "Application Supplement" on April 30, 1996, which stated her availability as from 4:00 a.m. to 6:00 a.m. and no later than 5:00 p.m.  (Def.'s Mot. for Summ. J, Ex. 5).

[7] The employees included Dawn Clark; Luis Rivera, Assistant Store Manager of Zone 2; Sondra Hauser, Personnel Training Coordinator; and Rochelle Rojas, Stock Manager.  Defendant alleges that approval of Plaintiff's request could not be given at the Adrian facility, but only from Defendant's corporate and regional offices.  (Def.'s Mot. for Summ. J., Dep. Tr. of Russell Geekie, at 11, Dep. Tr. of Sondra Hauser, at 51).  Plaintiff argues that this is incorrect, as Russell Geekie had the authority to alter employee schedules, as well as offer a temporary accommodation for Plaintiff until her accommodation request was approved by the necessary officials.  (Id., Dep. Tr. of Dave Kroll at 12).

5

of time, Plaintiff's needed accommodation would be over before a response would be returned, in

effect, there was nothing to grant.  (Def.'s Mot. for Summ. J., Dep. Tr. of Sandra Hauser).  She did

not send Plaintiff's paperwork on to the Area Human Resources Manager for review and approval.[8]

(Def.'s Mot. for Summ. J, Dep. Tr. Sondra Hauser at 40, 66).  Plaintiff inquired as to the status of

her request when 48 hours had come and gone, and at this point she realized her clerical error

regarding the dates of her request for accommodation.[9]  (*Id.* at 38).  Plaintiff filled out additional

paperwork and obtained another doctor's note.[10]  (*Id.* at 39).  Again, Ms. Hauser told Plaintiff it

would take 48 hours to process her request.  (Def.'s Mot. for Summ. J, Dep. Tr. Sondra Hauser, at

32, 34, 51).  After two days had once again come and gone, Plaintiff checked on the status of her

second request.  (Def.'s Mot. for Summ. J, Pl.'s Dep. Tr. at 80).   Plaintiff was then informed by

Dawn Clark that for the week beginning on November 17, 2003 and ending on the 21st, she would

have a set schedule from 7:00 a.m. to 4:00 p.m.[11]  (*Id.* at 31).  Plaintiff inquired if this was her new

schedule going forward, but Ms. Clark informed her that she could not guarantee this.  (*Id.*)  As of

November 14, 2003, Plaintiff had not received approval for her accommodation request, as such

---

[8]  It is unclear from Ms. Hauser's testimony if she did, or did not forward the paperwork to the Area HR Manager.

[9]  The record is unclear as to the date of this inquiry.

[10]  This second doctor's note did not state the same schedule restrictions as the previous note.  It stated that Plaintiff's "work day should be limited to 6-8 hrs. per day for one month. (Def.'s Mot. for Summ. J., Ex. 10).

[11]  Plaintiff asserts that although this was Ms. Clark's oral representation of Plaintiff's schedule, this was contrary to Ms. Clark's previous statements and to Plaintiff's published schedule which indicated Plaintiff was to work one day from 9:00 a.m. to 6:00 p.m.; one day from 6:00 a.m. to 3:00 p.m.; one day from 8:00 a.m. to 4:00 p.m.; and one day from 2:00 p.m. to 11:00 p.m.  (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 92, Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 7).

6

Plaintiff felt her health problems necessitated her resignation if she could not receive an accommodation.  (*Id.*)  Plaintiff handed in a written resignation to Sondra Hauser.[12]  (*Id.*).

## III.   APPLICABLE LAW AND ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact.  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon v. Cajon Co.*, 791 F.2d

---

[12]  The Court notes that the date of Plaintiff's resignation is somewhat unclear.  In her deposition, Plaintiff stated that she resigned on or about November 5, 2003 after a meeting with Russell Geekie, where he informed Plaintiff of his dissatisfaction with her work performance.  (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 28).  Later during Plaintiff's deposition, Plaintiff stated that when she handed her written resignation to Sondra Hauser on November 14, 2003, she backdated the document to reflect the date of November 5, 2003.  (*Id.* at 30).

It is Defendant's contention that Plaintiff's request for a set schedule was not medically necessary because, by her own admission, she wanted to be at home with her boyfriend.  Plaintiff testified:

> So, even if they put me on a four to whatever set schedule, I couldn't have done it without bringing  my MS on.  I could not physically have done it because then I am going to have the stress of going home, having to deal with not being able to make my husband or boyfriend whatever you want to call him, it's been thirteen years just about, his dinner.  He's going to want me in bed with him, so, he's going to be going, oh, you can't do that because you have to be in bed with me, so than I have to sleep in the guest bedroom from now on as long as I'm working that schedule which is putting a hardship on me as far as my home life.  (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 145).

43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).

But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry to summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact. "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact." *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted).

## B.   PWDCRA

The PWDCRA prohibits employers from terminating employees because of a disability. Specifically, an employer "shall not . . . discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position." M.C.L. 37.1202(1)(b). Plaintiffs must show three things in order to establish a prima facie case of discrimination under the PWDCRA: "(1) that [plaintiff] is disabled as defined by the PWDCRA; (2) that the disability is unrelated to [plaintiff's] ability to perform the duties of a

8

particular job; and (3) that [plaintiff] was discriminated against in one of the ways described in the statute." *Lown v. JJ Eaton Place*, 235 Mich. App. 721, 727 (1998) (citing *Rollert v. Dep't of Civil Service*, 228 Mich. App. 534, 538 (1998)).

Plaintiff's Compliant alleges that Defendant discriminated against her by its failure to accommodate her and its hostility towards her request for a set schedule. Plaintiff argues that she needed a set schedule in order to keep her multiple sclerosis under control. Defendant's failure to accommodate Plaintiff's request resulted in the onset of symptoms of her multiple sclerosis. Plaintiff further asserts that Defendant's actions constructively discharged Plaintiff as she was forced to terminate her employment because she could not work the irregular and excessive schedule set by Defendant. Defendant counters that Plaintiff does not have a disability under the PWDCRA, as such Plaintiff does not qualify for protection under the Act. Further, Plaintiff's set schedule request was not based on medical reasons, and that Defendant did not fail to accommodate Plaintiff, as Plaintiff abruptly resigned without giving Defendant adequate time to process her request. Defendant asserts that Plaintiff was not constructively discharged by Defendant because Plaintiff reacted unreasonably when Defendant did not immediately process her request.

### 1.      Disability

The PWDCRA, like many state statutes, is modeled on the Americans with Disabilities Act (ADA) (42 U.S.C.A. §§ 12101 et seq.), and many of the cases interpreting the PWDCRA have looked to federal case law and statutes for guidance. The PWDCRA defines a "disability" [in the employment context] as a:

> determinable physical or mental characteristic of an individual, which may result from the disease, injury, congenital condition of birth, or functional disorder, if the characteristic: . . . [s]ubstantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a

9

> particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

M.C.L. § 37.1103(d)(i)(A). Not every impairment rises to the level of a "disability." A Plaintiff must submit evidence from which a reasonable inference can be drawn that a major life activity is substantially limited, and not merely impaired. *Chiles*, 238 Mich. App. at 479; *Lown*, 235 Mich. App. at 731. "[W]hether a person has a disability . . . is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).[13] There is a three-step process followed by the Supreme Court for determining whether a plaintiff has a disability under the ADA. The court must: (1) consider whether a plaintiff is impaired; (2) identify the life activity on which the plaintiff relies, and determine whether it is considered a "major life activity" under the ADA; and (3) ask whether the identified impairment substantially limits the major life activity. *Chiles*, 238 Mich. App. at 474 (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998))[14]. Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Stevens v. Inland Waters, Inc.*, 220 Mich. App. 212, 217, 559 N.W.2d 61 (1996). To determine whether an impairment substantially limits a major life activity, the Court is guided by the following factors: 1) the nature and severity of the impairment; 2) its duration or expected duration; and 3) its permanent or expected permanent or long-term effect. *Stevens*, 220 Mich. App. at 218.

Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to

---

[13] The issue in *Sutton* was whether there was an ADA violation, not a state civil rights statute.

[14] The *Chiles* Court held that the test was suitable for analysis of actions brought under the PWDCRA. *Id.* at 474-75.

whether she suffered from a disability under the Act. Plaintiff testified that at least one of her impairments was physical in nature, that is, due to her inability to balance, coupled with a lack of coordination, her ability to walk was negatively affected.  Plaintiff also testified that when her multiple sclerosis flares up, a number of her life activities are impaired.  Plaintiff further stated that due to her erratic work schedule her multiple sclerosis symptoms were exacerbated.  Additionally, at the time of Plaintiff's deposition, August 17, 2004, almost a year after her transfer to the electrical department, Plaintiff stated that she was still experiencing the symptoms that first presented themselves when she was transferred.

The Court is cognizant of the fact that in an unpublished opinion, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the defendant where the plaintiff alleged that her employer failed to accommodate her request for a day shift instead of a night shift.  *Salim v. MGM Grand Detroit, L.L.C.*, 106 Fed. Appx. 454 (6th 2004).  The *Salim* plaintiff suffered from diabetes, and asserted that she needed to work during the day in order to control her sugar levels.  *Id.* at 455.  The circumstances of *Salim* are distinguishable from Plaintiff's circumstances in the present matter.  As a result of Plaintiff's transfer to the electrical department and subsequent schedule change, Plaintiff's multiple sclerosis symptoms became exacerbated and she was unable to keep her multiple sclerosis under control.  However, in *Salim*, the "[p]laintiff's ability to control her blood sugar was a problem both before, during, and after her tenure at MGM."  *Id.* at 460-61.  Additionally, the Sixth Circuit noted:

> Plaintiff testified that, prior to her discharge from MGM, her life was pretty normal. She stated that she was happy and able to do her normal housework and admitted that her diabetes prevented her only from lifting more than 20 pounds.  Although Plaintiff experienced uncomfortable symptoms while at work, Plaintiff testified that she did not experience them outside of the workplace.

11

*Id.* at 460.  In addition, the *Salim* plaintiff did not have any supporting evidence  "that her diabetes

has progressively worsened . . . ."  *Id.*    These facts are contrary to Plaintiff's neurologist's

November 5, 2003 note, as well as Plaintiff's deposition testimony where she stated that she had

been able to control her multiple sclerosis until her schedule changed.  Plaintiff testified, "I've

worked a set schedule for seven-and-a-half years. I had no . . . signs of MS whatsoever and they put

me on a fluctuating schedule and now its back."  (Def.'s Mot. for Summ. J., Pl.'s Dep. Tr. at 23-

24).[15]

## 2.  Reasonable Accommodation

Defendant also argues that it did not refuse to accommodate Plaintiff's request for a set

schedule because Plaintiff expected Defendant to immediately grant Plaintiff's request. Since both

the regional and corporate offices had to approve Plaintiff's request, Defendant's delay in processing

Plaintiff's request was not unreasonable.

Defendant argues that it is the law of this Circuit that a plaintiff "cannot base a disability

discrimination claim upon an employer's delay in providing a requested accommodation where the

delay is due to internal processing or to events outside the employer's control."  *Gerton v. Verizon

South Inc.,* 145 Fed. Appx. 159, 168 (6th Cir. 2005).  The *Gerton* Court held that a delay in

---

[15]  Defendant also argues that Plaintiff must establish that her multiple sclerosis limits
one or more of her major life activities at the time of Defendant's discriminatory act.  *Kocsis v.
Multi-Care Mmgt., Inc.*, 97 F. 3d 876, 884 (6th Cir. 1996).  Defendant asserts that at the time it
made its decision to transfer Plaintiff to the electrical department, Plaintiff was not disabled.
The Defendant's decision to transfer Plaintiff to another department was not the discriminatory
act; the discriminatory act was Defendant's failure to accommodate Plaintiff's request for a set
schedule. The Court will not address this argument further, or any assertion that Defendant did
not know of Plaintiff's multiple sclerosis at the time she was transferred, or the assertion that
Plaintiff's claim fails because the decision was not based on her disability.  Plaintiff's transfer to
the electrical department is not the discriminatory act, at least in regard to her PWDCRA claim.

processing an employee's request for accommodation must be unreasonable in order for the plaintiff to make out a prima facie case of disability discrimination based on a defendant's failure to accommodate. Defendant further argues that since the Court held that the defendant "reasonably accommodated Gerton, even though the accommodation was not at the exact time of her request[,]" a similar finding is appropriate in the instant matter. *Id.* at 168. The facts in *Gerton* are distinguishable from the facts of the present case. The plaintiff in *Gerton*, a Directory Assistance Operator, suffered from carpal tunnel syndrome. *Id.* at 161. The defendant's Operator Center had two departments, the Toll Operators utilized a computer's number key pad to find numbers, while the Directory Assistance Operators utilized a full computer keyboard to type in names and addresses. *Id.* It was easier for the plaintiff to utilize the number key pad in the toll operator department instead of the full blown computer keyboard in the directory assistance department due to her carpal tunnel syndrome, as she only had to use one hand in the former department as opposed to both hands. *Id.* Unlike the facts in the present matter, after the plaintiff's request for an accommodation, the defendant temporarily transferred the plaintiff to the toll operator department. *Id.* At the time of this temporary transfer, the plaintiff did not have a doctor's note or other verification indicating her need to work in the toll operator department to alleviate the symptoms of her carpal tunnel syndrome. *Id.* The defendant began processing her ADA accommodation request, but kept the plaintiff in the temporary Toll assignment until a decision was obtained on plaintiff's ADA request. *Id.* at 162. The Plaintiff was not transferred back to Directory Assistance until she failed to provide the defendant with the necessary medical records to support her request. *Id.* In the instant matter, there is no dispute that Defendant did not provide Plaintiff with a temporary accommodation until her request was approved by the regional and corporate offices. While the Defendant asserts that

13

it had to wait for this approval to grant Plaintiff's request for an accommodation, at least one of Defendant's employees testified that Mr. Geekie had the authority to provide Plaintiff with a temporary accommodation.  The Plaintiff has also presented a genuine issue as to Defendant's reasonableness in delaying Plaintiff's request, as it appears that Ms. Hauser was aware of a discrepancy in Plaintiff's provided paperwork compared to her treating neurologist's November 5, 2003 note indicating that Plaintiff needed a set schedule for an indefinite period of time.

### 3.  Constructive Discharge

Defendant argues that Plaintiff's constructive discharge claim must fail because of Plaintiff's hasty resignation when she did not immediately receive a response to her request for an accommodation.  Plaintiff counters that because Defendant was hostile and resistant to honoring her request, Plaintiff reasonably felt compelled to resign.

In order to establish a claim for constructive discharge, Plaintiff must demonstrate that Defendant's "conduct was so severe that a reasonable person in [Plaintiff's] place would feel compelled to resign." *Jacobson v. Parda Fed. Credit Union*, 457 Mich. 318, 328, 577 N.W.2d 881 (Mich. 1998).  Defendant argues that when Plaintiff did not receive an immediate response to her request, she incorrectly assumed that the approval of her request would not be forthcoming.  Defendant asserts that it was Plaintiff's "obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.*, 932 F. 2d 510, 515 (6th Cir. 1991).

Plaintiff has produced sufficient evidence to create a genuine issue of fact as to whether a reasonable person would have felt compelled to resign when faced with the same circumstances that were before Plaintiff in November 2003.  Plaintiff's multiple sclerosis symptoms reappeared after a seven year absence once she was assigned to a variable work schedule in the electrical department.

14

On November 6, 2003, several of Defendant's employees were provided with a note from Plaintiff's neurologist indicating that Plaintiff needed a set schedule.  Further, when Plaintiff incorrectly filled out the accommodation request paperwork, Defendant's employee, Ms. Hauser, did not follow-up with Plaintiff and determine if her intention was to request a one-day accommodation.  Further, when Plaintiff resubmitted her paperwork request, she was informed that it would take 48 hours to process her request and this did not occur.  This was the second time that Plaintiff was informed that her request would take 48 hours.  Plaintiff's supervisor's actions were contrary to her previous statement that she would try to work with Plaintiff's needs for a set schedule.  Ms. Clark determined that Plaintiff had put 'open availability' on her application and told Plaintiff there was nothing she could do.  Her supervisor later instructed  Plaintiff that she could no longer change shifts with other employees, and continued to give Plaintiff an irregular schedule while Plaintiff's request was being processed.  Lastly, Plaintiff was never offered a temporary accommodation even though it appears that Defendant had the ability to provide Plaintiff such relief while her accommodation was being processed.   Based on this evidence, a jury could determine that an employee in Plaintiff's place would feel compelled to resign in order to prevent further exacerbation of her multiple sclerosis symptoms.

### C.  Gender Discrimination

The burden shifting approach developed for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972) is also applicable to Michigan's Elliott-Larsen Act.  *Allen v. Comprehensive Health*, 222 Mich. App. 426, 429, 564 N.W.2d 914 (1997).  Under *McDonnell Douglas*, a plaintiff establishes a prima facie case and creates a presumption of discrimination by showing by a preponderance of the evidence: (1) that he/she belongs to a protected class; (2) that

he/she was subjected to an adverse employment action; (3) that he/she was qualified for the job; and

(4) that he/she was treated differently from similarly situated employees from a non-protected class.

*McDonnell Douglas*, 411 U.S. at 802; *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th

Cir. 1995); and *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich. App. 347, 361 (1991).

Alternatively, a plaintiff could establish a prima facie case by presenting credible, direct evidence

of discriminatory intent. *Terbovitz v. Fiscal Court of Adair County*, 825 F. 2d 111 (6th Cir. 1987);

*Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582, note 4 (6th Cir. 1992).

If a plaintiff proves a prima facie case, the burden of persuasion shifts to the employer to

articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell*

*Douglas*, 411 U.S. at 802.  Even though the burden of going forward is on the defendant once a

plaintiff has established a prima facie case, the ultimate burden of persuasion never shifts from the

plaintiff. *Id*.  Once the employer carries this burden, the burden then shifts back to plaintiff to prove

by a preponderance of the evidence that the legitimate reasons offered by the employer were not its

true reasons, but were a pretext for discrimination.  *Id*.; *Ang v. Proctor & Gamble Co.*, 932 F. 2d

540, 548 (6th Cir. 1991).  The plaintiff may meet this burden by showing: 1) that the stated reasons

had no basis in fact; 2) that the stated reasons were not the actual reasons; or 3) that the stated

reasons were insufficient to explain the employer's action.  *Wheeler v. McKinley Enters*., 937 F. 2d

1158, 1162 (6th Cir. 1991).  The burden of persuasion always remains, however, with the plaintiff.

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Defendant first argues that Plaintiff did not suffer an adverse action.  In the employment

context, an adverse action is "materially adverse in that it is more than mere inconvenience or an

alteration of job responsibilities . . . there must be some objective basis for demonstrating that the

16

change is adverse because a plaintiff's subjective impressions as to the desirability of one position over another are not controlling." *Wilcoxin*, 235 Mich. App. at 364 (internal citations omitted). Plaintiff has presented sufficient evidence to create a genuine issue of fact as to whether her transfer to the electrical department was more than a mere inconvenience, and as such was an adverse action. Due to the inconsistent nature of the electrical department's scheduling, Plaintiff suffered almost immediate exacerbation of her multiple sclerosis symptoms. This is more than a subjective impression on Plaintiff's part that her schedule in the stock department was more desirable than her schedule in the electrical department. Plaintiff had a medical need for a set schedule, a medical need that was documented by her neurologist and provided by written confirmation to Defendant.

Next, Defendant argues that Plaintiff can not establish that similarly situated male employees were treated more favorably than she was treated. Plaintiff has submitted enough evidence on this issue for the jury to determine that similarly situated employees were treated more favorably than their female counterparts. Defendant's records demonstrate that on the very day of Plaintiff's transfer from the stock department, a male employee was transferred to the stock department. This fact brings Defendant's assertion that Plaintiff's transfer was based upon seasonal needs into question, and creates a genuine issue of material fact on this issue.

Lastly, Defendant argues that its decision to transfer Plaintiff was not discriminatory, but based upon seasonal and staffing needs. Defendant asserts that Plaintiff is merely questioning Mr. Geekie's management decisions. As previously discussed, the fact that a male employee was transferred into the stock department the day that Plaintiff was transferred out of the department contravenes Defendant's assertion that seasonal slowdowns mandated a decrease in the number of employees in the stock department. Further, there is evidence that Mr. Geekie changed his mind

17

about transferring all of the female employees out of the stock department after he was confronted

by a female employee, Ms. Rincon.  After Ms. Rincon's questioning of Mr. Geekie, it appears that

he decided to have her remain in the stock department.  This evidence is more than unsupported,

self-serving allegations of discrimination as Defendant argues.  There is a genuine issue of fact as

to whether Defendant's proffered explanation was mere pretext.

**IV.    CONCLUSION**

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment [**Docket No. 20, filed

January 17, 2006**] is DENIED.


Dated: October 10, 2006                               /s/ Denise Page Hood
                                                     DENISE PAGE HOOD
                                                     United States District Judge

**Proof of Service**

The undersigned certifies that a copy of the foregoing Order Denying Defendant's Motion for Summary Judgment was served on the attorneys of record herein by electronic means or U.S. Mail on **October 10, 2006**.

                    s/Kim Grimes
                    Acting in the absence of
                    William Lewis, Case Manager

18